Michael Goldberg (admitted *pro hac vice*)
Jeffrey Snow
Felicity Kohn (admitted *pro hac vice*)
PRYOR CASHMAN LLP
7 Times Square
New York, NY  10036
mgoldberg@pryorcashman.com
jsnow@pryorcashman.com
fkohn@pryorcashman.com
(212) 421-4100
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---------------------------------------------------------X
TWO CANOES LLC,

                Plaintiff,

- against -

AOBVIOUS STUDIO LLC and ADDIAN INC.
d/b/a MEDIA FULFILLMENT,

                Defendants.

---------------------------------------------------------X
AOBVIOUS STUDIO LLC,

                Third-Party Plaintiff,

        -against-

ADDIAN INC. d/b/a MEDIA FULFILLMENT,

                Third-Party Defendant.

---------------------------------------------------------X

Civil Action No. 2:21-CV-19729

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiff Two Canoes LLC ("TC" or "Plaintiff"), by its attorneys, Pryor Cashman LLP, as and for its Amended Complaint herein, alleges as follows:

## PARTIES

1. Plaintiff TC is a Delaware corporation authorized to do business in New York, with an office at 767 Fifth Avenue, New York, New York 10153.  TC provides consulting services and is an incubator for multiple scalable early-stage companies and is, *inter alia,* in the business of selling personal protective equipment ("PPE") including, in particular, surgical gloves.

2. Defendant Aobvious Studio LLC ("Aobvious") is, upon information and belief, a New Jersey limited liability company with an address and place of business at 57 Allwood Place, Clifton, NJ 07012.  Upon information and belief, Aobvious, *inter alia,* sells PPE, including gloves and masks.

3. Defendant Addian Inc. d/b/a Media Fulfillment ("Addian") is a Wisconsin corporation, which is registered as a foreign corporation with, and has its principal place of business in, the state of Georgia.

## JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

5. Venue is proper in this District under 28 U.S.C. § 1391(b) & (c) because a substantial part of the events giving rise to the claims occurred in this District and because Defendant is deemed to reside in this District by virtue of being subject to personal jurisdiction here.

## FACTS

6. In or around 2020, during the COVID-19 pandemic, TC had several clients who were urgently looking to acquire 3M brand masks to fill open orders and meet the demands of their customers.

7. The particular brand was of critical importance to customers at this early point in the global COVID-19 pandemic because the 3M brand was synonymous with high-quality masks that customers felt confident in using for virus protection, including providing them to front-line medical workers.

**Defendants Offer To Supply Authentic 3M Brand Masks**

8. In or around August 2020, Aobvious reached out to TC and advised that it had access to authentic 3M masks that it could sell. Aobvious's supplier for these masks was Addian.

9. Aobvious and Addian (together, "Defendants") entered the personal protective equipment ("PPE") market at the start of the COVID-19 pandemic.

10. TC had previously purchased other PPE through this supply chain, namely, Addian supplied PPE to Aobvious, who in turn supplied the goods to TC.

11. By the time Aobvious reached out to TC regarding the availability of genuine 3M masks through this supply chain, both Aobvious and Addian had been regularly dealing in goods of this kind for at least five months.

12. Defendants were, by that time, active and well-known sellers of PPE.

13. Addian represented itself as a company that has experience dealing in PPE, particularly during the COVID-19 pandemic, and whose skill and knowledge in this area could be relied upon to obtain and supply genuine 3M products. For instance, Addam Woolworth, Addian's principal, told TC that he had supplied authentic 3M PPE to other U.S. hospital chains.

14. Moreover, Mr. Woolworth personally represented to TC that he was extremely skilled in the area of PPE, including sales of PPE products.

15. Relying on Defendants' assurances that they would supply only authentic 3M masks, TC subsequently contacted Qanex, Inc. ("Qanex"), whom it knew to be in the market for authentic 3M masks to supply to its downstream customers.

**The North Carolina Order**

16. In or about August 2020, TC placed an order with Aobvious for approximately 279,840 3M 1860 masks at a price of $3.70 per mask, to be supplied by Addian and subsequently sold to TC's customer, Qanex. The ultimate purchaser of the masks from Qanex was the North Carolina Division of Emergency Management ("NCDEM").

17. Both Aobvious and Addian were aware that TC was purchasing the masks to be sold to Qanex, who in turn was purchasing them for sale to NCDEM (hereinafter, these masks are referred to as the "North Carolina Masks").

18. TC would not have entered into this transaction were it not for assurances by both Defendants that the masks at issue were authentic 3M product.

19. The masks sold to NCDEM (the "North Carolina Masks") were sold by TC to Qanex for $1,427,184.

20. After the agreement with NCDEM was confirmed (the "North Carolina Contract"), upon information and belief, Addian sold the North Carolina Masks to Aobvious, who in turn, upon information and belief, paid Addian for the North Carolina Masks.

21. Aobvious then invoiced TC for the North Carolina Masks.

22. Thereafter, TC paid Aobvious $1,035,408, constituting payment in full for the North Carolina Masks, which were delivered to Qanex's customer in North Carolina, upon information and belief, directly from Addian.

23. Shortly after the North Carolina Masks were delivered, NCDEM contacted Qanex and raised serious concerns regarding the North Carolina Masks' authenticity. Specifically, the labels on the boxes and containers appeared to be inauthentic, and the masks themselves had certain characteristics which raised serious questions as to whether the goods were counterfeit 3M products.

24. Given its concerns and the fact that the North Carolina Masks were being used by doctors and nurses treating COVID-19 patients, NCDEM refused to accept and pay for the North Carolina Masks.

25. After NCDEM's grave concerns about the authenticity of the goods were reported upstream, in an effort to minimize the scope of any potential dispute and to keep important customers happy, it was Addian who offered to accept return of the goods and to entirely replace them with new, compliant goods.

26. By way of example, in a text message chain including principals of TC, Aobvious, Addian, and Qanex, on or about September 11, 2020, Addam Woolworth of Addian stated, "Bottom line for me is that if they feel uncomfortable I'd like to put my best foot forward and go about getting them something they don't consider counterfeit." Thus, Addian expressly agreed to accept return of the North Carolina Masks, and then to replace them.

27. Thereafter, on several occasions both orally and in writing, both Defendants agreed to accept a return of all of the North Carolina Masks and pledged to promptly deliver replacement goods.

28. Mr. Woolworth also reiterated his assurances that the masks supplied by Addian were authentic 3M masks. In particular, on or about September 20, 2020, Mr. Woolworth provided a letter to representatives of TC and Aobvious which, upon information and belief, was intended to be provided to their downstream customers, including but not limited to NCDEM, assuring them that "[t]hroughout this crisis, we have supplied personal protective equipment to those in need. We are able to deliver 3M 1860 healthcare respirators, and have successfully done so."

29. In reliance on Defendants' agreement to accept return of and to replace the North Carolina Masks, and in reliance on Addian's further assurances regarding the authenticity of its

3M masks, TC and Qanex arranged with NCDEM for return and replacement of the North Carolina Masks.

30. Subsequently, all of the 279,840 North Carolina Masks were returned ultimately to Addian.

31. For its part, Addian accepted the return of all 279,840 North Carolina Masks, in partial fulfillment of its agreement.

32. Notwithstanding Defendants' assurances that all of the North Carolina Masks would be replaced, only 156,000 replacement units were delivered by Aobvious to NCDEM (the "North Carolina Replacement Masks").

33. The other 123,840 replacement units were never delivered by Aobvious.

34. Upon information and belief, Addian never delivered the remaining 123,840 North Carolina Replacement Masks to Aobvious, notwithstanding its prior commitment to do so.

35. Shortly thereafter, 3M sued, *inter alia*, Aobvious and Addian in Federal District Court in the Middle District of Georgia, asserting that the North Carolina Replacement Masks that they sold and delivered were counterfeit 3M masks (the "Counterfeiting Litigation").

36. In connection with the Counterfeiting Litigation, the Court issued an order pursuant to which the North Carolina Replacement Masks were seized.

37. Ultimately, the Counterfeiting Litigation was settled.

38. As part of that settlement, the Defendants, including both Aobvious and Addian, consented to the destruction of all of the North Carolina Replacement Masks.

39. Accordingly, although TC paid Aobvious in full for the North Carolina Masks, those masks were returned with approval from Aobvious and Addian but never replaced, except for the limited North Carolina Replacement Masks which were subsequently seized by Court Order

and destroyed on consent of the parties to the Counterfeiting Litigation. In sum, TC paid for 279,840 masks, but received neither the masks nor a refund for its purchase.

40. Notwithstanding the foregoing, and despite repeated demand, Aobvious refused to repay TC for the amounts TC paid to Aobvious for the North Carolina Masks.

41. Upon information and belief, Addian has refused to refund to Aobvious the amounts Aobvious paid to Addian for the North Carolina Masks.

**The Foreign Masks**

42. Separately, in or about October 2020, TC placed an order with Aobvious, to be fulfilled by Addian, for approximately 100,800 3M 1860s masks at a price of $3.25 per mask, also for sale to Qanex. The ultimate purchaser of the masks from Qanex was a foreign hospital group (the "Foreign Hospital Contract").

43. The masks related to the Foreign Hospital Contract (the "Foreign Hospital Masks") were sold by TC to Qanex for $403,200.

44. Defendants knew of the importance to the foreign hospital group that the masks be genuine 3M product.

45. In purchasing the masks from Aobvious for re-sale to Qanex, TC relied upon the assurances made by both Defendants that the masks supplied by Addian to Aobvious would be genuine 3M masks.

46. Following confirmation of the Foreign Hospital Contract, the Foreign Hospital Masks were invoiced by Aobvious.

47. The Foreign Hospital Masks were delivered to TC, and TC paid Aobvious in full, $327,600, for the Foreign Hospital Masks.

48. Upon information and belief, Aobvious in turn paid Addian for the Foreign Hospital Masks.

49. Shortly after receiving the Foreign Hospital Masks, TC learned of NCDEM's complaints regarding the North Carolina Replacement Masks and requested a return authorization for the Foreign Hospital Masks.

50. TC did not want to deliver counterfeit masks to another customer.

51. Aobvious and Addian consented to the return of the Foreign Hospital Masks.

52. Aobvious agreed to promptly refund the money paid by TC for the Foreign Hospital Masks.

53. All of the Foreign Hospital Masks were returned to and accepted by both Defendants Aobvious and Addian.

54. However, TC never received a refund for the amount paid to Aobvious for the Foreign Hospital Masks despite Aobvious' assurances to the contrary.

55. Upon information and belief, Addian never refunded the money it had received for the Foreign Hospital Masks to Aobvious, despite representations that it would do so.

**Defendants Ignore Their Obligations**

56. Aobvious and Addian have failed and refused to uphold their obligations to TC pursuant to contract and the UCC to refund the monies TC paid for the North Carolina Masks and the Foreign Hospital Masks, which were never delivered to the end-customer, or were delivered and promptly seized, and for which TC never received payment.

57. Aobvious and Addian agreed to accept return of and replace all of the North Carolina Masks. The North Carolina Masks were returned, and ultimately, accepted by Addian. However, only a fraction of those masks were replaced, and the ones that were replaced were

subsequently seized pursuant to a federal court order and ultimately destroyed on consent of both Defendants.

58. TC has received no refund for (i) the goods for which Defendants accepted return but did not replace, or (ii) the goods that were replaced and promptly seized and destroyed on Defendants' consent.

59. Aobvious and Addian also agreed to accept return of the Foreign Hospital Masks due to concerns as to whether they were genuine 3M goods. The Foreign Hospital Masks were returned, and ultimately, the return was accepted by Addian. But TC has received no refund for the payment it made to Aobvious for the Foreign Hospital Masks.

60. Aobvious has been unable to offer any explanation or reasonable defense for retaining the money it received from TC for the North Carolina Masks and Foreign Masks (together, the "Goods").

61. Similarly, Addian has been unable to offer any explanation or reasonable defense for retaining the money that, upon information and belief, it received from Aobvious for the Goods.

62. Upon information and belief, Addian now has all of the Goods, with the exception of the North Carolina Replacement Masks which were destroyed on its consent, and all of the money paid for the Goods.

**Qanex Threatens Suit Against TC**

63. On or about June 8, 2021, Qanex sent a letter to TC demanding approximately $8 million in damages resulting from alleged lost profits, cancellation of pending orders, and damage to reputation stemming from the North Carolina Masks which had to be returned, the limited number of North Carolina Replacement Masks which were then seized pursuant to Court Order, and the Foreign Hospital Masks which were never delivered, and for the costs associated with

Qanex's having to defend itself in connection with the Counterfeit Litigation related to the goods delivered by TC which were supplied by Aobvious and Addian.

64. Defendants are liable to TC and must indemnify TC against all losses and damages, including reasonable attorneys' fees, incurred in defending against the claims of Qanex, and any liability it may incur to Qanex in connection with the allegedly counterfeit 3M masks.

**AS AND FOR A
FIRST CAUSE OF ACTION
(Breach of Contract against Aobvious)**

65. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 64, as if fully set forth herein.

66. The North Carolina Contract and the Foreign Hospital Contract (collectively the "Contracts") were valid and binding in all respects.

67. The North Carolina Masks and Foreign Hospital Masks sold and delivered by Aobvious to TC pursuant to those Contracts (collectively the "Goods") were alleged to have been counterfeit.

68. TC complied with its obligations in all respects with regard to the Contracts, and paid Aobvious in full for all of the Goods delivered thereunder.

69. Aobvious agreed to the return and replacement of the North Carolina Masks and the return and reimbursement for the Foreign Hospital Masks, issued return authorizations, and accepted and acknowledged receipt of the Goods.

70. In breach of the North Carolina Contract, Aobvious refused to replace the bulk of the returned North Carolina Masks.  It provided only the North Carolina Replacement Masks, a fraction of the original order, which were then alleged to be counterfeit, seized pursuant to Court Order and subsequently destroyed with the approval of Aobvious.  And it never repaid TC amounts

paid for the North Carolina Masks despite its uncontroverted failure to deliver the contracted-for goods.

71. In breach of the Foreign Hospital Contract, Aobvious also failed to reimburse TC the money it paid for the Foreign Hospital Masks, which were returned to Aobvious with permission and received by Aobvious.

72. As a result of the foregoing, Aobvious is liable to TC in an amount to be proven at trial, but believed to be in excess of $1,900,000.00, including the lost profits related to the Goods, incidental and consequential damages related to Aobvious' breaches of the Contracts, and interest from the date when TC's funds should have been repaid.

## AS AND FOR A
## SECOND CAUSE OF ACTION
### (Breach of Warranty – Indemnification against Aobvious and Addian)

73. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 72, as if fully set forth herein.

74. The claims asserted by TC in this action are based on the alleged counterfeit nature of the Goods that were purchased by Plaintiff from Aobvious, who in turn purchased them from Addian, and which Goods were, as agreed by the parties, delivered by Addian, either to the end-customer or to TC.

75. TC's customer, Qanex, has made demands for reimbursement of losses and payment of other damages against TC for selling it counterfeit goods, and TC is alleged to be liable to Qanex.

76. Pursuant to NJ Stat. § 12A:2-312 ("UCC 2-312"), Defendants warranted that the Goods were free from any claim by a third party for trademark infringement, trade dress infringement, and copyright infringement.

77. Pursuant to NJ Stat. § 12A:2-314 ("UCC 2-314"), Defendants warranted that the Goods purchased by TC would be merchantable.

78. Defendants are, and were at the time of the Contracts, merchants with respect to the goods that TC purchased from them.

79. Defendants breached the implied warranty under UCC 2-312 that the goods would be free from any claim of trademark or copyright infringement, and breached the implied warranty under UCC 2-314 that the goods would be merchantable.

80. Defendants assured TC and Qanex that the Goods were genuine, and subsequently breached their warranties by selling the Goods, which were alleged by 3M to be counterfeit.

81. Had Defendants not assured TC and Qanex that the Goods were genuine, and had the Goods not been packaged in such a manner as to make them appear to be genuine products manufactured by 3M, neither TC nor Qanex would have purchased the Goods, nor would TC or Qanex have re-sold the Goods.

82. As a result of Defendants' breaches of the implied warranties under UCC 2-312 and UCC 2-314, TC is entitled to indemnification from Defendants for all costs and attorneys' fees incurred in defending claims brought against it by Qanex.

83. The breach of Defendants' warranties under UCC 2-312 and UCC 2-314 also entitle TC to indemnification from Defendants for any liability it may incur to Qanex or any other party that received the Goods by way of settlement or judgment in an action, including damages, assessments or obligations of any kind.

84. As a result of the foregoing breaches of warranties, Defendants are liable to TC and must indemnify TC against all losses and damages, including reasonable attorneys' fees, and

must further indemnify TC against all costs and fees incurred in defending against the claims of Qanex, and any liability it may incur to Qanex by way of settlement or judgment.

**AS AND FOR A
THIRD CAUSE OF ACTION
(Breach of Warranty – Damages against Aobvious and Addian)**

85. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 84, as if fully set forth herein.

86. Pursuant to UCC 2-312, Defendants warranted that the Goods were free from any claim by a third party for trademark infringement, trade dress infringement, copyright infringement and similar claims.

87. Pursuant to UCC 2-314, Defendants warranted that the Goods would be merchantable.

88. Defendants breached their warranties to TC.

89. TC paid Aobvious in full for the Goods.

90. Upon information and belief, Aobvious paid Addian in full for the Goods.

91. Claims have been asserted that the Goods were counterfeit, and the Goods were not merchantable.

92. As a result of Defendants' breaches of their warranties pursuant to UCC 2-312 and 2-314, TC has incurred damages in the amount of the purchase price paid for the Goods, together with its lost profits from the sale of the Goods, the costs incurred in handling and transporting the Goods, together with other consequential and incidental damages and attorneys' fees.

## AS AND FOR A
## FOURTH CAUSE OF ACTION
### (Breach of Express Warranty against Aobvious and Addian)

93. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 92, as if fully set forth herein.

94. Aobvious described the masks it supplied as genuine 3M 1860 masks.

95. Addian described the masks it supplied as genuine 3M 1860 Masks.

96. Both Defendants repeatedly assured TC that the product they were supplying was genuine and authentic 3M product.

97. Defendants' description of the masks supplied through Defendants' supply chain as authentic 3M masks was the basis of the bargain.

98. Had the masks not been described as authentic 3M masks, TC would not have entered into either of the Contracts.

99. The product supplied by Defendants did not conform to the description provided by Defendants, as the masks' authenticity was questioned by NCDEM, which subsequently reported its concerns to 3M, which in turn instituted the Georgia Litigation alleging the masks to be counterfeit.

100. In connection with the Georgia Litigation, Defendants consented to the destruction of the North Carolina Replacement Masks.

101. Thus, upon information and belief, the masks were not authentic 3M 1860 masks and Defendants breached their express warranties to the contrary pursuant to N.J. Stat. §12A:2-313.

102. As a consequence of Defendants' breaches of their express warranties, TC has incurred damages in the amount of the purchase price paid for the Goods, together with its lost

profits from the sale of the Goods, the costs incurred in handling and transporting the Goods, together with other consequential and incidental damages and attorneys' fees.

## AS AND FOR A
## FIFTH CAUSE OF ACTION
**(Breach of Warranty of Fitness for a Particular Purpose against Aobvious and Addian)**

103. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 102, as if fully set forth herein.

104. TC expressly made known to Defendants that its customer Qanex, and Qanex's downstream customers, required authentic 3M masks because the 3M brand provided necessary assurances to the customers, and those to whom they planned to distribute the masks, as to the masks' quality and ability to protect users during the COVID-19 crisis.

105. Defendants each represented themselves as skilled in the field of PPE such that TC could rely upon their knowledge, skill, and judgment to obtain authentic 3M masks.

106. The product supplied by Defendants did not conform to the particular purpose for which the product was required, as the masks' authenticity was questioned by NCDEM, which subsequently reported its concerns to 3M, which in turn instituted the Georgia Litigation alleging the masks to be counterfeit.

107. In connection with the Georgia Litigation, Defendants consented to the destruction of the North Carolina Replacement Masks.

108. Thus, upon information and belief, the masks supplied by Defendants were not authentic 3M 1860 masks and Defendants breached their warranties to the contrary pursuant to N.J. Stat. § 12A:2-315 that the goods would be fit for the particular purpose required, namely, that they would be authentic 3M goods.

109. As a consequence of Defendants' breaches of their warranties of fitness for a particular purpose, TC has incurred damages in the amount of the purchase price paid for the Goods, together with its lost profits from the sale of the Goods, the costs incurred in handling and transporting the Goods, together with other consequential and incidental damages and attorneys' fees.

**AS AND FOR A
SIXTH CAUSE OF ACTION
(Negligent Interference with Prospective Economic Advantage against Aobvious and Addian)**

110. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 109, as if fully set forth herein.

111. Aobvious and Addian were aware that TC intended to re-sell the Goods to third parties, and knew that TC had entered into contracts with third parties for the sale of the Goods.

112. Aobvious and Addian were aware or should have been aware that if they did not act with due care to ensure that the Goods were not counterfeit, their actions would interfere with TC's relationship with its customers, and cause TC to lose the economic benefits of its agreements with its customers.

113. Aobvious and Addian were negligent in that, despite having reason to suspect the origin of the Goods sold to TC, Aobvious and Addian failed to verify the origin and source of the goods, and failed to verify the genuineness of the Goods.

114. After the original allegations that the Goods were counterfeit, Aobvious and Addian accepted the return of the Goods but still delivered the North Carolina Replacement Goods which were also alleged to be counterfeit, and which Aobvious and Addian agreed could be seized and destroyed in the context of the Counterfeiting Litigation.

115. Defendants' negligence and willful misconduct caused damage to TC by virtue of the fact that TC's customers have threatened legal action against it, and have refused to place orders for any other goods.

116. As a direct result of the foregoing, TC is entitled to damages for the negligent conduct of Aobvious in an amount to be determined at trial, but believed to be in excess of $1,000,000.

**WHEREFORE**, Plaintiff Two Canoes LLC respectfully demands judgment in its favor and against Aobvious Studio LLC and Addian Inc. d/b/a Media Fulfillment as follows:

(a) On the First Cause of Action, an award of damages in favor of TC and against Aobvious in an amount to be proven at trial, but believed to be in excess of $1,900,000.00, including the lost profits related to the Goods, incidental and consequential damages related to Aobvious' breaches of the Contracts, and interest from the date when TC's funds should have been repaid;

(b) On the Second Cause of Action, indemnification of TC by Defendants against all losses and damages, including reasonable attorneys' fees, in defending the claims of Qanex and its customers, and any liability it may incur to Qanex by way of settlement or judgment;

(c) On the Third Cause of Action, indemnification by Defendants against all damages incurred by TC in the amount of the purchase price paid for the Goods, together with its lost profits from the sale of the Goods, and the costs incurred in handling and transporting the Goods, plus other consequential and incidental damages and attorneys' fees;

(d) On the Fourth Cause of Action, indemnification by Defendants against all damages incurred by TC in the amount of the purchase price paid for the Goods, together with its lost profits

from the sale of the Goods, and the costs incurred in handling and transporting the Goods, plus other consequential and incidental damages and attorneys' fees;

(e) On the Fifth Cause of Action, indemnification by Defendants against all damages incurred by TC in the amount of the purchase price paid for the Goods, together with its lost profits from the sale of the Goods, and the costs incurred in handling and transporting the Goods, plus other consequential and incidental damages and attorneys' fees; and

(f) On the Sixth Cause of Action, damages for the negligent conduct of Defendants in an amount to be determined at trial, but believed to be in excess of $1,000,000;

(g) Together with such other, further and different relief as this Court deems just and proper.

Dated: New York, New York
May 6, 2022

        PRYOR CASHMAN LLP
        *Attorneys for Plaintiff*

        By: */s/ Jeffrey Snow*
            Michael G. Goldberg (admitted *pro hac vice*)
            Jeffrey Snow
            Felicity Kohn (admitted *pro hac vice*)
        7 Times Square
        New York, New York 10036-6569
        mgoldberg@pryorcashman.com
        jsnow@pryorcashman.com
        fkohn@pryorcashman.com
        (212) 421-4100