<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| TWO CANOES LLC,<br><br>                    Plaintiff,<br><br>v.<br><br> ADDIAN INC., *et al.*,<br><br>                    Defendant. | Civil Action No: 21-19729 (SDW) (JRA)<br><br>**OPINION**<br><br>April 22, 2025 |

**WIGENTON**, District Judge.

Before this Court is Plaintiff Two Canoes LLC's ("TC") motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56.  (D.E. 104.)  Jurisdiction is proper pursuant to 28 U.S.C. § 1332.  Venue is proper pursuant to 28 U.S.C. § 1391.  This opinion is issued without oral argument pursuant to Rule 78.  For the reasons stated herein, TC's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

## I.    FACTUAL BACKGROUND

This dispute arises from transactions involving allegedly counterfeit respiratory masks during the COVID-19 pandemic.  (Second Am. Compl., D.E. 60 ("SAC") ¶ 2.)  TC alleges that Defendant Addian Inc. ("Addian") imported masks into the United States and sold them to Aobvious Studio LLC ("Aobvious"), which sold the masks to TC, which sold the masks to Qanex, Inc. ("Qanex"), which sold the masks to two end users: the North Carolina Department of Emergency Management ("NCDEM") and a Dubai hospital group named Al Azmath.  (*Id.*)  Addam Wolworth is the principal of Addian (*id.* at ¶ 27); Noam Kamelhar is the principal of

Aobvious (D.E. 106-54 ¶ 1); Mesh Gelman is the principal of TC (D.E. 106-58 ¶ 1), and Bachir Diagne is the principal of Qanex (D.E. 106-1 ("PSMF") ¶ 8(iii); D.E. 107-1 ("DSMF")[1] ¶ 8). TC alleges that the parties above it in the supply chain, Aobvious and Addian, represented that the masks were produced by 3M Company ("3M"). (SAC ¶ 3.) When doubts arose as to the masks' authenticity, Aobvious and Addian allegedly agreed to replace the masks delivered to NCDEM with authentic ones and fully refund Al Azmath. (*Id.* at ¶¶ 5–6.) According to TC, the masks were returned but never replaced or refunded as agreed. (*Id.* at ¶ 7.)

Addian characterizes the events quite differently. It denies ever selling masks to Aobvious, asserting instead that Addian "was a mere service provider middleman" that assisted with shipping and logistics and "was not responsible for assuring authenticity." (D.E. 107 ("Opp.") at 17, 26.) According to Addian, Addian was only paid a "commission" for its service as a middleman, and that invoices for its services "includ[ed] commissions on top of the underlying goods price." (*Id.* at 8.) Addian also insists that Aobvious acted only as a broker and did not sell masks to TC. (*Id.* at 6, 9.)

The following facts are undisputed. On July 20, 2020, Mr. Kamelhar sent a message to Mr. Wolworth stating "Need soMe 3m 1860," and Mr. Wolworth responded "Well… we can do that now." (PSMF ¶ 8(i); DSMF ¶ 8; D.E. 106-55 at NK 005614.) Mr. Wolworth also sent photographs to Mr. Kamelhar showing 3M-branded masks as early as July 21, 2020. (PSMF ¶ 9 (citing D.E. 106-55 at NK005614); DSMF ¶ 9 (agreeing that "Addian provided photographs of the masks at issue that appear to display a 3M logo").) On August 4, 2020, Mr. Kamelhar "asked Mr.

---

[1] Docket Entry 107-1 contains both Defendant's Response to Plaintiff's Statement of Material Facts (on pages 1–44) and Defendant's Statement of Additional Facts (on pages 44–65). Because the paragraph numbering restarts for the Defendant's Statement of Additional Facts, for the avoidance of confusion, Defendant's Response to Plaintiff's Statement of Material Facts will be referred to as DSMF, and Defendant's Statement of Additional Facts will be referred to as DSAF.

Wolworth for information concerning the masks, including the factory's FDA info and device numbers." (PSMF ¶ 8(ii); DSMF ¶ 8; D.E. 106-55 at NK 005636.)  Mr. Wolworth responded "have this for you by the am latest … It's 3M shanghai if that means anything in the interim." (PSMF ¶ 8(ii); DSMF ¶ 8; D.E. 106-55 at NK 005636.)  On September 11, 2020, in a text conversation containing Messrs. Wolworth, Kamelhar, Gelman, and Diagne (the "Group Chat"), Mr. Wolworth stated that "The 3M people mentioned [a sticker on the boxes of the masks] serves as a seal from 3M which also serves a local tax purpose." (PSMF ¶ 8(iii); DSMF ¶ 8; D.E. 106-69 at TC00018115.)  On September 16, 2020, Mr. Diagne asked the Group Chat whether a lot delivered to NCDEM was "verifiable by 3m," and Mr. Wolworth responded "Yes." (PSMF ¶ 8(iv); DSMF ¶ 8; D.E. 106-69 at TC00018131.)

As for the specific transactions, TC produced three documents with the heading "Pro-Forma Invoice." (D.E. 106-14; D.E. 106-15; D.E. 106-16.)  They each have Addian's name and contact information at the top, and Mr. Kamelhar and Aobvious's information in a "Sold To:" field. (D.E. 106-14; D.E. 106-15; D.E. 106-16.)  The first is dated August 13, 2020 and lists 99,840 "3M 1860" at a price of $3.275, totaling $326,976.  (D.E. 106-15.)  That precise quantity of masks was delivered to NCDEM on August 31, 2020, and Aobvious paid Addian for that shipment in payments on August 20 and September 1, 2020 totaling $335,462.40.  (D.E. 106-11 ¶¶ 18, 23–24; PSMF ¶ 16; DSMF ¶ 16; DSAF ¶ 56; D.E. 108-1 ("PSAF") ¶ 56; D.E. 106-22 at ADDIAN_000755.)

The second invoice is dated August 31, 2020 and lists 180,000 "3M 1860" at a price of $3.350, totaling $603,000.  (D.E. 106-16.)  That precise quantity of masks was delivered to NCDEM around September 4, 2020.  (PSMF ¶ 35; DSMF ¶ 35; D.E. 106-11 ¶¶ 27–28.)  Aobvious

paid Addian the amount provided in the invoice on September 3, 2020.  (D.E. 106-11 ¶ 29; PSMF ¶ 29; DSMF ¶ 29; D.E. 106-22 at ADDIAN_000755.)

The parties dispute whether Addian "accepted" a return of the NCDEM masks,[2] but it is undisputed that Addian later "arranged for the pick-up of all the purported 3M masks from NCDEM, and also organized the delivery of replacement goods."  (PSMF ¶ 84; DSMF ¶ 84.)  On September 22, 2020, Mr. Wolworth signed the bill of lading indicating that Addian had received all 279,840 masks previously delivered to NCDEM.  (PSMF ¶ 86; DSMF ¶ 86.)  Addian shipped 156,000 replacement masks to NCDEM, which were delivered in October 2020.  (PSMF ¶¶ 88–90; DSMF ¶¶ 88–90.)  On November 6, 2020, the replacement masks were seized pursuant to a separate lawsuit, discussed below.  (PSMF ¶ 94; DSMF ¶ 94.)  In connection with the NCDEM transactions, on September 23, 2020, Mr. Wolworth also signed a letter affirming that Addian was "able to deliver 3M 1860 healthcare respirators, and ha[s] successfully done so."  (D.E. 106-70 at TC0004122; D.E. 106-11 ¶ 13.)

The third invoice is dated October 9, 2020 and lists 100,800 "3M 1860S" at a price of $2.850, totaling $287,280.  (D.E. 106-14.)  Aobvious paid Addian in full for this transaction in payments on October 16 and October 20, 2020, totaling $661,761.  (PSMF ¶ 42; DSMF ¶ 42; D.E. 106-22 at ADDIAN_000755.)  Addian's supplier, on Mr. Wolworth's instructions, shipped the 100,800 masks to Hong Kong, where they arrived around October 23, 2020 for eventual shipment

---

[2] It is undisputed that Mr. Diagne shared with the Group Chat a draft email stating, in connection with the NCDEM masks, "The supplier stands by the genuineness of the goods but we will replace any product not satisfactory to 3M," and Mr. Wolworth responded "I am definitely ok with that."  (PSMF ¶ 78; DSMF ¶ 78 (not disputing that these messages were sent); D.E. 106-69 at TC00018119.)  Mr. Wolworth also stated, with regard to the NCDEM masks, "In the meantime, I think we should exercise one of the options offered.  We're able to have the product returned and be refunded" (PSMF ¶ 79; DSMF ¶ 79; D.E. 106-69 at TC00018120), "Bottom line for me is that if they feel uncomfortable I'd like to put my best foot forward and go about getting them something they don't consider counterfeit" (PSMF ¶ 80; DSMF ¶ 80; D.E. 106-69 at TC00018118), and "For NC, [lot number] B20018 is not good product, we want to work on replacing those goods as soon as they'll allow us to.  If they'll have the goods staged for shipment, I will arrange freight to my warehouse, and the goods will be replaced in a 7-10 day period" (PSMF ¶ 81; DSMF ¶ 81, D.E. 106-69 at TC00018131).

to Dubai.    (PSMF ¶ 49; DSMF ¶ 49; D.E. 106-68 at TC00003703; D.E. 106-19 at ADDIAN_000292.)  Mr. Diagne requested a letter of authorization from 3M, and Addian was unable to produce one.  (PSMF ¶¶ 72–73, 75; DSMF ¶¶ 72–73, 75.)  TC initiated a return of the goods.  (PSMF ¶ 97; DSMF ¶ 97.)  According to TC, the goods were returned to Addian's supplier.  (PSMF ¶ 99.)  Addian denies having knowledge of the details of the return because, when a return would have occurred, Addian "was under a [Temporary Restraining Order issued in a separate case] not to transact in 3M goods."  (DSMF ¶¶ 98–99 (describing Addian as "forbidden at the time by Court order from participating").)  Addian never refunded Aobvious or TC for the money spent on the Al Azmath goods.  (PSMF ¶ 125; DSMF ¶ 125.)

It is also undisputed that separately, on November 4, 2020, 3M sued Addian in the Northern District of Georgia for selling counterfeit 3M masks.  (PSMF ¶ 92; DSMF ¶ 92; D.E. 106-37.)  On November 6, 2020, that court issued an order finding that 3M would likely succeed on its claim that Addian was "falsely portraying an affiliation with … 3M" and selling counterfeit 3M products.  (PSMF ¶ 93; DSMF ¶ 93.)  It also ordered seizure of the replacement masks sent to NCDEM and any other 3M-branded products in Addian's possession.  (PSMF ¶ 93; DSMF ¶ 93.)  It was pursuant to a court order in the Northern District of Georgia case that all 156,000 replacement masks sent to NCDEM were destroyed.  (PSMF ¶ 104; DSMF ¶ 104.)  Aobvious and TC were added to that case as defendants on December 21, 2020.  (PSMF ¶ 95; DSMF ¶ 95.)  That lawsuit settled, and as part of the settlement Addian agreed to never distribute, advertise, broker, or sell 3M-branded goods or claim to be affiliated with 3M in any way.  (PSMF ¶ 101; DSMF ¶ 101; D.E. 106-43.)

## II.     **PROCEDURAL HISTORY**

TC's initial complaint in this matter, filed on November 4, 2021, named only Aobvious as a Defendant. (D.E. 1.) When Aobvious answered, on January 7, 2022, it also filed a third party complaint against Addian. (D.E. 4.) TC amended its complaint on May 6, 2022, including Addian as a Defendant. (D.E. 34.) Aobvious amended its answer on May 16, 2022 and included crossclaims against Addian. (D.E. 35.) Addian answered the amended complaint on May 20, 2022 (D.E. 36) and the crossclaims on May 31, 2022 (D.E. 38).

On September 19, 2022, Aobvious assigned all claims it "had … or may have" against Addian to TC. (Ex. A to SAC.) On September 27, 2022, the Court signed a consent decree between TC and Aobvious. (D.E. 48.) Therein, Aobvious made various admissions, including that it purchased the masks at issue "from Addian to fill an order placed with it by Two Canoes," that "Addian refused to refund any money for [the masks at issue] and also refused to cover any damages sustained by downstream customers by reason of its sale of goods alleged to be counterfeit … despite its express acknowledgement … that it intended to refund the monies it received for the NCDEM Masks and Al Azmath Masks," and that "Aobvious owes Two Canoes $1,363,008.00, plus interest and a duty of indemnification for any amounts owed by Two Canoes as a result of the supply of allegedly counterfeit 3M masks, and has claims directly against Addian for these amounts." (*Id.* at 3–5.) The consent decree also provided for dismissal of all of TC's claims against Aobvious with prejudice. (*Id.* at 8.)

Following dismissal of TC's claims against Aobvious (D.E. 56), TC filed the second amended complaint on December 9, 2022, naming only Addian as a Defendant (SAC). TC claimed breach of contract, breach of the implied warranties of merchantability and against infringement, breach of express warranty, breach of warranty for a particular purpose, and negligent interference

with prospective economic advantage.  (*Id.* at ¶¶ 80–145.)  On October 16, 2023, TC moved for sanctions against Addian for Addian's spoliation of evidence.  (D.E. 87; D.E. 88.)  The Court found that Addian spoliated electronically stored information but reserved ruling on prejudice and sanctions until trial.  (D.E. 95; D.E. 100.)

TC filed the motion for summary judgment presently before the Court on September 27, 2024.  (D.E. 104.)  TC seeks summary judgment on only the breach of contract, breach of warranty of merchantability, breach of warranty against infringement, and breach of express warranty claims.  (D.E. 106 ("Mot.") at 15–16.)  Addian opposed on October 11, 2024 (Opp.), and TC replied on October 18, 2024 (D.E. 108 ("Reply")).

## III.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.  "Hence, in moving for summary judgment, … the parties must point out to the court the proper substantive law.  Armed with the proper substantive law, the court will then scrutinize the record for genuine issues …."  *Jo-Ann, Inc. v. Alfin Fragrances, Inc.*, 731 F. Supp. 149, 153 (D.N.J. 1989).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 247.  A dispute that merely involves "some metaphysical doubt as to the material facts" is not genuine.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

On summary judgment, the movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247). If the moving party meets this initial burden, the burden shifts to the nonmovant who "must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which ... [it has] the burden of proof[,]" then the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322–23.

On summary judgment, the court may not make credibility determinations or weigh the evidence; instead, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255). "[T]he court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial … constru[ing] the facts and inferences in the light most favorable to the non-moving party." *Capitalplus Equity, LLC v. Prismatic Dev. Corp.*, Civ. No. 07-321, 2008 WL 2783339 (D.N.J. July 16, 2008).

There is, however, "no issue for trial unless the nonmoving party can demonstrate that there is sufficient evidence favoring the nonmoving party so that a reasonable jury could return a verdict in that party's favor." *First Valley Leasing, Inc. v. Goushy*, 795 F. Supp. 693, 696 (D.N.J. 1992).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Am. Seating Co. v. Archer Plastics Inc.*, Civ. No. 11-53, 2012 WL 2937338, at *6 (D.N.J. July 18, 2012) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Self-serving, conclusory affidavits and testimony, when contradicted by other record evidence, are insufficient to create a genuine dispute of material fact. *Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011) (finding "self-serving deposition testimony" which conflicted with deponent's "earlier testimony and … other record evidence … insufficient to raise a genuine issue of material fact"); *Marrin v. Cap. Health Sys., Inc.*, Civ. No. 14-2558, 2017 WL 2369910, at *17–20 (D.N.J. May 31, 2017) (granting summary judgment despite nonmovant's "conclusory" affidavit contradicted by record evidence).

## IV.   <u>DISCUSSION</u>

### A.  BREACH OF CONTRACT

Under New Jersey law,[3] a breach of contract contains four elements: (1) "the parties entered into a contract containing certain terms;" (2) "plaintiffs did what the contract required them to do;" (3) "'defendants did not do what the contract required them to do,' defined as a 'breach of the contract;'" and (4) "defendants' breach, or failure to do what the contract required, caused a loss to the plaintiffs." *Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021) (quoting *Globe Motor Co. v. Igdalev*, 139 A.3d 57, 64 (N.J. 2016)).

---

[3] The parties do not dispute that New Jersey law applies to the breach of contract claim.  (*See* Mot. at 16 (citing *RNC Sys., Inc. v. Mod. Tech. Grp., Inc.*, 861 F. Supp 2d 436, 444–45 (D.N.J. 2012)); Opp. at 14 (citing *Available Trade Int'l, LLC v. Tekno Prod., Inc.*, Civ. No. 19-14851, 2021 WL 7907665, at *3–4 (D.N.J. Aug. 24, 2021)).) "Seeing no clear reason to deviate from this assumption, the Court will apply New Jersey law." *Available Trade*, 2021 WL 7907665, at *3 n.3.

###### i.  Contract Formation

The parties' dispute here begins with the first element—whether they entered into contracts.  TC argues that the invoices issued by Addian to Aobvious[4] establish that contracts existed.  (Mot. at 16.)  TC relies on cases applying the Uniform Commercial Code ("UCC") rule that "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  (*Id.* (citing *Flag Serv. & Maint., Inc. v. Kirchner Truck & Equip.*, 2010 WL 2795376, at *3 (N.J. Super. Ct. App. Div. July 2, 2010)).)  TC argues that the "Addian invoices constitute binding contracts," especially because "the parties acted in conformity with [them]."  (*Id.* at 16–17.)  Among several arguments in opposition, Addian asserts that it never sold goods in the transactions at issue.  (Opp. at 17.)  Instead, Addian states it was "a mere service provider middleman."  (*Id.*)  Accordingly, Addian argues, even if the invoices were "a final, operative writing between the parties," they reflected only Addian's sale of its services, not a sale of goods.  (*Id.* at 19.)

The dispute over whether Addian sold goods or services is a threshold, material one because it determines whether the UCC applies.  "Article 2 [of the UCC] applies to contracts for the sale of 'goods,' N.J. Stat. Ann. § 12A:2-102, not to contracts for services."  *Riachi v. Prometheus Grp.*, 822 F. App'x 138, 143 (3d Cir. 2020).  TC's only theory of contract arises under the UCC, and its cited cases all apply the UCC.  *Am. Seating*, 2012 WL 2937338, at *4 n.2 (considering "mixed contract for goods and services" in which "the sales aspect predominate[d]," making the UCC applicable);[5] *Flag Serv.*, 2010 WL 2795376, at *3 (noting that defendant "does

---

[4] Because Aobvious assigned its claims against Addian to TC, TC asserts this breach of contract claim as if it were in the position of Aobvious.  (Mot. at 16.)

[5] *Am. Seating* also considered a second contract, which the court did not explicitly find was for either goods or services. *Am. Seating*, 2012 WL 2937338, at *6–7.  TC's reliance on *Am. Seating* is limited to the first contract, however; it was the only one in which the court considered the parties' performance indicative of contract formation.  (*See* Mot. at 17.)

not dispute that he is a merchant" and applying UCC provisions); *First Valley*, 795 F. Supp. at 696 ("[I]t is clear that, because the disputed transaction involved the sale of goods, the [UCC] will govern the court's analysis.").

The next question is whether this dispute is genuine, or whether, given the evidence, "a reasonable trier-of-fact could find in favor of the nonmovant." *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020). In support of its contention that Addian sold the masks to Aobvious, TC offers the invoices, which identify Mr. Kamelhar of Aobvious as the party "Sold To" and specific quantities and prices of 3M masks. (D.E. 106-14; D.E. 106-15; D.E. 106-16.) Undisputedly, the quantities of masks on the invoices were shipped and Addian was paid in full for these transactions. (D.E. 106-11 ¶¶ 18, 23–24, 27–29; PSMF ¶¶ 16, 29, 42, 49; DSMF ¶¶ 16, 29, 42, 49; DSAF ¶ 56; PSAF ¶ 56; D.E. 106-22 at ADDIAN_000755; D.E. 106-68 at TC00003703; D.E. 106-19 at ADDIAN_000292.) TC also cites Addian's admissions that it purchased the masks from a supplier, Topway Cargo, which support that Addian owned, and sold, the masks, instead of just providing shipping services. (D.E. 106-5 153:25–154:14 (Q: Was Topway paid for these masks? A: Yeah, that's — that's fair to say. Q: What company paid Topway? A: Addian. Q: Was Addian paid? A: Yes. Q: What company paid Addian? A: Aobvious."); D.E. 106-7 38:11–15 ("Q: Okay. Did Addian pay money for the masks that it delivered in Hong Kong? A: Yes. Q: Who was that money paid to? A: Topway Cargo.").)

Addian insists that it was paid only for its services as a logistics provider. (Opp. at 17.) Careful review of the record reveals that Addian's only support for this contention is Mr. Wolworth's declaration and deposition testimony. Specifically, Addian cites Mr. Wolworth's testimony that the nature of Addian's business is "[d]irect mail marketing fulfillment" and "online e-commerce order fulfillment" (D.E. 107-3 17:17–19:9), his denials that he ever sold masks

followed by elusive, vague explanations (*id.* at 125:22–126:4 (Q: And Addian represented on this document that Aobvious would purchase 3M 1860 masks from Addian; correct? … A: I — I'm not — you know, I'm not super sophisticated, so the — that's not — to me it just communicated what, you know, basically what money would be spent on the goods."), 126:24–127:21 (Q: Were [the masks], in fact, sold to Aobvious? … A: No, it was — it seemed well communicated and well understood. … Q: I'm sorry. Can you say that again? A: It seemed well communicated and well understood that I was going to ship them because I was familiar with what that would take."); D.E. 107-4 at 81:14–82:23, 97:2–21 ("I wasn't selling masks. It was — you know, in my business it's mostly — you know, they are mostly projects, and if I was going to itemize invoices or summaries of what is being paid for, they would be incredibly long.")), and his testimony that Addian arranged delivery of masks from one warehouse to NCDEM (D.E. 107-3 at 145:25–146:11).[6]

Mr. Wolworth's declaration and deposition testimony are insufficient to create a genuine dispute. *See Irving*, 439 F. App'x at 127; *Demodulation, Inc. v. Applied DNA Scis., Inc.*, Civ. No. 11-00296, 2014 WL 12857171, at *6 (D.N.J. June 11, 2014) (finding self-serving affidavit insufficient to "create a genuine issue of material fact … given [movant's] well-supported showing to the contrary"). The invoices do not enumerate charges for services or shipping; they provide only for the sale of goods.[7] Regardless of how preliminary they were, and even if they alone are

---

[6] Addian also cites Mr. Kamelhar's deposition testimony for the proposition that Aobvious never purchased masks and was also merely a broker. (DSAF ¶¶ 26, 62.) The cited portions of the transcript, however, conflict with Mr. Kamelhar's subsequent clarification, in the same deposition, that "[he] d[id]n't think" he was acting as a broker in the specific transactions at issue. (D.E. 108-3 88:5–89:9.) Mr. Kamelhar's subsequent declaration also states that Addian sold masks to Aobvious. (D.E. 106-54 ¶ 8.)

[7] According to Addian, the pro-forma invoices "map how commissions might get applied if someone engages Addian's services." (DSAF ¶ 57.) This is not credible; the invoices provide only a price of goods and indicate nothing about commission. (D.E. 106-14; D.E. l06-15; D.E. 106-16.) Regardless of whether Addian calculated that price based on its intended commission or markup, the invoices themselves absolutely do not "map how commissions might get applied."

not contracts, Mr. Wolworth himself testified that the invoices illustrate "what a transaction would hopefully eventually look like." (D.E. 106-5 124:22–24.) Addian was paid for goods—it insists that it was paid "for its <u>services</u>" and makes much of the fact that it immediately forwarded most of the money it received, "less commission" to Topway. (PSMF ¶¶ 16, 29, 42; DSMF ¶¶ 16, 29, 42.) In view of Mr. Wolworth's testimony that Addian paid Topway for masks (D.E. 106-5 153:25–154:10), this necessarily shows that Addian was also paid for masks. Regardless of how quickly it was forwarded, Aobvious paid Addian the price of the goods. (*See* Opp. at 8 (emphasis added) (stating that invoices "includ[ed] commissions *on top of the underlying goods price*").) If Addian were only selling services, it would make no sense for it to have purchased the masks from Topway and then forward most of the payments it received for its "services" to Topway. Addian also does not argue that Aobvious or anyone else down the line paid another entity for the cost of the goods, while only paying Addian for services. All of the documentary evidence supports that Addian sold goods to Aobvious, and Addian offers no credible, non-conclusory evidence in rebuttal.[8]

Mr. Wolworth's testimony was also somewhat equivocal—he denied selling masks but also testified that the dollar amounts on the invoices indicated "what money would be spent *on the goods*" (D.E. 106-5 at 125:22–126:4) (emphasis added) and that Aobvious paid Addian for masks (*id.* at 130:21–23 (Q: Who did Aobvious pay for those masks? A: Who did Aobvious pay? Aobvious sent me money, yes."); D.E. 106-7 56:10–20 (stating that October 20, 2020 payment

---

[8] Had Addian argued that the contracts were for both goods and services, the outcome would be the same. To determine whether mixed contracts are predominately for the sale of goods or services, "courts look to the language and circumstances surrounding the contract, the relationship between the goods and services, the compensation structure and the intrinsic worth of the goods provided." *Integrity Material Handling Sys., Inc. v. Deluxe Corp.*, 722 A.2d 552, 555 (N.J. Super. Ct. App. Div. 1999). Aobvious was charged a price per mask, and the ultimate goal of the transaction was to provide goods; shipping was a necessity "tangential to the primary purpose of the transaction," so the sale of goods was predominant. *Id.* (finding that deal to dismantle, remove, and liquidate business equipment was predominately a sale of goods).

from Aobvious to Addian could have been for goods). Taking this testimony, the invoices, and the payments together, there is no genuine dispute that Addian bought the masks from Topway and sold them the Aobvious. Addian cites no record evidence aside from Mr. Wolworth's testimony and declarations attempting to characterize the transactions as anything other than a sale of goods, and those attempts are simply confuted by the rest of the record.

Because Addian sold Aobvious goods, the UCC applies to the transactions. The next question is whether, under the UCC, contracts were formed. "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." N.J.S.A. § 12A:2-204. This rule has been satisfied when the record included an "invoice … on a letterhead containing [the seller's] name and address, [which] clearly described and delineated the number of items that were the subject of the transaction and the price terms, and [evidence that the buyer had] paid a $20,000 deposit pursuant to that invoice, which [the seller] accepted." *Flag Serv.*, 2010 WL 2795376, at *4 (finding that this evidence "*amply* support[ed]" the existence of a contract (emphasis added)). An invoice specifying the price and items to be sold, combined with the seller's acceptance of payment, is sufficient to withstand the defense that "there was no meeting of the minds … as to the essential elements of the contract." *First Valley*, 795 F. Supp. at 696–97 (applying § 12A:2-204(1)). Objective, outward conduct, including compliance with a written agreement, is the barometer for determining whether a contractual relationship was intended, "not … the subjective intent of one of the parties." *Id.* ("It is undisputed … that defendant submitted an invoice listing twenty-six items and accepted payment for those items. Viewed objectively, this activity indicates the existence of a contract."); *see also Am. Seating*, 2012 WL 2937338, at *4.

Here, the invoices contained Addian's business information and delineated the goods to be sold and for what price. (D.E. 106-14; D.E. l06-15; D.E. 106-16.) The parties acted consistently with them. The precise amount of masks in each invoice was shipped shortly after the date of each invoice. (D.E. 106-11 ¶¶ 18, 23, 27–28; D.E. 106-68 at TC00003702–03; D.E. 106-19 at ADDIAN_000292.) Addian was paid in full for each transaction reflected on the invoices.[9] (D.E. 106-11 ¶¶ 18, 23–24, 27–29; PSMF ¶¶ 16, 29, 42; DSMF ¶¶ 16, 29, 42; D.E. 106-22 at ADDIAN_000755.) The shipments' alignment with the invoices and Addian's acceptance of payment for those shipments is sufficient to establish a contractual relationship. This is consistent with *Flag Serv.* and *First Valley*, and it is also logical—the parties' behavior shows that their minds met enough to agree that Addian would cause the shipment of the masks described in the invoices, and that Aobvious would pay Addian. Without pointing to anything else that the payments were for, Addian cannot have it both ways by accepting payments but insisting no deals were reached.

Addian asserts that the invoices were only preliminary "pro-forma invoices" serving "no function except to illustrate what a real invoice might eventually look like." (Opp. at 2.) This is insufficient to establish a genuine issue of material fact in light of the parties' conduct that clearly shows the deal progressed past the preliminary stage. *See Am. Seating*, 2012 WL 2937338, at *4 ("Defendant's protest that the Purchase Order did not constitute an agreement to [sic] is belied by Defendant's own performance."). The invoices' being labeled "Pro-Forma" simply does not change that they and the party's conduct are sufficient to show agreement. In any event, "a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is

---

[9] Only in the second transaction was there evidence that Aobvious paid Addian the exact dollar amount on the invoice. In the first and third transactions, Aobvious's payments to Addian exceeded the amounts provided on the invoices. (PSMF ¶ 42; DSMF ¶ 42; DSAF ¶ 56; PSAF ¶ 56; D.E. 106-22 at ADDIAN_000755.) Still, Addian does not argue that it was accepting payment for anything outside of these transactions, and it agrees that it was paid in full for the shipments of the exact quantities of masks provided on the invoices. And in any event, under N.J.S.A. § 12A:2-204(3), even if the price terms on the invoices were indefinite, these invoices are still contracts. (*See infra* pp. 15–16.)

15

a reasonably certain basis for giving an appropriate remedy." N.J.S.A. § 12A:2-204(3). Any argument that the invoices were so preliminary as to be indefinite is of no moment in light of the parties' conduct showing their intent to contract.

Addian's cited cases are also distinguishable. In *Available Trade*, the defendant refused to pay charges that it said it only learned of after the plaintiff performed. 2021 WL 7907665, at *1. Unlike here, the defendant had not performed because it had not yet paid the disputed charges. *Id.* at *2. There was also a genuine material dispute over the parties' prior conduct regarding these types of charges, which would inform whether the parties had a meeting of the minds on how those charges were typically handled. *Id.* at *3–4. The defendant's lack of performance and course-of-dealing were issues that, in *Available Trade*, gave rise to the question of whether there was mutual assent, but they are not present here.

As for *GlobalGeeks, Inc. v. SZN, LLC*, it appears that the record available to the court there was very different from the one here. Civ. No. 20-06838, 2023 WL 3585313, at *3–4 (D.N.J. May 22, 2023). In both cases, there were invoices, and the alleged seller argued that it was only a broker of the deal. *Id.* at *1, *3. But in *GlobalGeeks*, unlike here, the movant offered "scant evidentiary support" to explain how a contract existed, instead relying on only the factual allegations in its third-party complaint. *Id.* at *3 ("[Movant's statement of material fact] does not even stipulate whether the alleged contract was a written or oral one."). The nonmovant cited record evidence that "ma[d]e clear there [wa]s a fundamental factual dispute regarding whether a purchase contract ever existed," including the possibility that the invoice was created after delivery. *Id.* The factual disputes "implicate[d] complex theories of liability under the Uniform Commercial Code that ha[d] not been adequately briefed" given the scarce evidentiary showing. *Id.* at *4. Here, TC has set forth, and supported with documentary evidence, its theory of contract formation and liability

under the UCC. Addian has not offered sufficient evidence to the contrary to create a genuine dispute of material fact. While *GlobalGeeks* and this case share similar allegations and arguments, they differ starkly when it comes to support for those arguments in the record, which is critical on summary judgment.

### ii.    Plaintiff's Performance

The next element of breach of contract, Plaintiff's performance under the contracts, is not in dispute. Addian agrees that it was paid in full for each transaction represented on the invoices. (D.E. 106-11 ¶¶ 18, 23–24, 27–29; PSMF ¶¶ 16, 29, 42; DSMF ¶¶ 16, 29, 42; D.E. 106-22 at ADDIAN_000755.)

### iii.    Defendant's Breach

TC argues that "Addian breached the terms of the contracts by selling Aobvious counterfeit 3M masks." (Mot. at 17.) Its evidentiary support includes documents from the district court that oversaw 3M's litigation against Addian. That court found that 3M would likely show that Addian was selling counterfeit 3M goods, granted injunctive relief, and directed the seizure of any 3M-branded products in Addian's possession as well as the replacement masks provided to NCDEM. (PSMF ¶ 93; DSMF ¶ 93; D.E. 106-38.) It also adopted Addian's consent order with 3M permanently enjoining Addian from doing business involving 3M-branded goods and from claiming any affiliation to 3M. (PSMF ¶¶ 101, 105; DSMF ¶¶ 101, 105; D.E. 106-43.) TC further supports its claim of breach with the fact that downstream consumers of the masks raised concerns that the goods were counterfeit (PSMF ¶¶ 67, 77, 121; DSMF ¶¶ 67, 77, 121; D.E. 106-81), Addian's inability to obtain a Letter of Authorization from 3M which was required to have the goods tested (PSMF ¶ 73; DSMF ¶ 73; D.E. 106-69 at TC00018219), and statements by 3M

personnel that the masks were likely counterfeit (PSMF ¶¶ 107–11, 114–20; DSMF ¶¶ 107–11, 114–20; D.E. 106-45; D.E. 106-84; D.E. 106-85).[10]

Addian offers no record evidence to support authenticity, but it argues that authenticity "makes no difference at this stage unless it were undisputedly Addian's responsibility to make sure the masks were not counterfeit." (Opp. at 20.) Addian denies ever assuming that responsibility. (DSAF ¶¶ 96–97.) In other words, according to Addian, because there was no meeting of the minds on "the parties' respective obligations as to … verifying authenticity," summary judgment would not be warranted even if the masks were counterfeit. (Opp. at 20.)

This opinion has already established that Aobvious and Addian had a meeting of the minds. (*See supra* pp. 14–16.) The evidence supporting that conclusion also supports that the masks' being 3M was part of that meeting of the minds. Mr. Wolworth's texts, enumerated above, show that the agreement was for 3M masks from its inception (*see supra* pp. 2–3),[11] and the invoices also specified that the masks were 3M (D.E. 106-14; D.E. 106-15; D.E. 106-16). The September

---

[10] Addian argues that much of this evidence is inadmissible. (DSMF ¶¶ 67, 77, 107–11, 114–21.) At the summary judgment stage, the Court can consider these statements because they are "*capable of being admissible at trial.*" *Fraternal Ord. of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016) (quoting *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1275 n.17 (3d Cir. 1995)). TC "identified the third-party declarants, and nothing suggests that those declarants would be unavailable to testify at trial." *Id.* at 239; *see also Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 102 (3d Cir. 1999) ("We will assume that Blackburn's testimony regarding what Zileski told him was effectively a proffer of the testimony that Zileski himself would give at trial, and we therefore treat this as evidence capable of being admitted at trial.").

[11] Addian disputes that two of Mr. Wolworth's text messages represented that the masks were 3M. According to Addian, Mr. Wolworth's response stating "we can do that now" to the request for 3M masks was "facetious." (DSAF ¶ 118.) Its explanation, that "Addian and Aobvious had just spoken the day prior about receiving samples of the same products," and the cited deposition testimony (D.E. 107-3 132:17–24) do not support that his answer was facetious. Addian also states that by responding to the request for device numbers and factory information, Mr. Wolworth merely meant to "provide[] what he believed to be the 3M regional headquarters as a possible search parameter to filter for devices on the FDA website that Aobvious would need to identify to update its importer registration." (DSAF ¶ 119.) This is not supported by the context of the text messages. (*See* D.E. 106-55 at NK 005636.) Even if these explanations were supported, the responses are still representations that the masks were produced by 3M.

23, 2020 letter[12] and the photographs that Mr. Wolworth sent[13] also support that the brand of masks was part of the basis of the bargain. It is not necessary that there was ever a conversation where the parties specifically discussed who was responsible for verifying authenticity—the evidence shows all along that Addian offered to sell 3M masks.[14] Addian's claim that it "did not provide assurances as to authenticity of the goods at issue" (Opp. at 12) is simply false.

Addian's only evidence to the contrary is, again, Mr. Wolworth's deposition testimony that is irrelevant or belied by the record. Mr. Wolworth denied having the expertise to determine whether the masks were authentic. (D.E. 107-3 131:8–22 ("I didn't have a basis to understand if they were authentic. This isn't my business."), 163:11–14 ("As far as authenticity is concerned, … that's not my call; that's not something that I have the purview to deem true or untrue.").) Addian offers no evidence that it communicated as much to Aobvious, but it still asserts that Aobvious did not believe that Addian was responsible for authenticity. (Opp. at 107; DSAF ¶ 102 ("Aobvious did not believe Addian was able to determine whether 3M products were legitimate or

---

[12] According to TC, the letter was "[t]o assuage NCDEM's concerns about the authenticity of the delivery." (PSMF ¶ 8(v).) Addian asserts that this letter was not an assurance to TC, and that it "would not have signed any letter with the understanding that it was going to be used as an assurance of authenticity that was not Addian's responsibility." (DSMF ¶ 8; *see also* Opp. at 25 (describing the letter as "ha[ving] nothing to do with making assurances to Aobvious or Two Canoes.").) When viewed against the record evidence, these statements are simply not true. Addian undisputedly signed this letter, which contains an assurance that the goods are 3M, and provided the letter to TC and Aobvious. (D.E. 106-70 at TC0004122; D.E. 106-79 at TC00018240.)

[13] Addian states that it provided the photographs "as part of its middleman information passing role, and did not do so in order to represent that they were 'authentic.'" (DSMF ¶ 9.) This opinion has already established that Addian acted as a seller. Regardless of whether Addian intended to represent authenticity by sending these pictures, by an objective understanding, it was providing its buyer with photographs of the goods it was selling, which included a 3M logo.

[14] Addian's conduct after the transactions also supports that the parties had a meeting of the minds that Addian would supply authentic 3M masks. Around September 11, 2020, while discussing the NCDEM masks, Mr. Wolworth texted the Group Chat that he would "like to put [his] best foot forward and go about getting them something they don't consider counterfeit." (D.E. 106-69 at TC00018118.) Around September 16, 2020, he stated that "The products being tested are at the lab, and we'll have those results as soon as possible," and that a shipment sent to NCDEM "is not good product, we want to work on replacing those goods as soon as they'll allow us to." (*Id.* at TC00018131.) Around November 3, 2020, he stated that "while [the masks in Hong Kong] come from a credible Chinese distributor, a documentary trail is going to be too complicated." (*Id.* at TC00018219). These statements are inconsistent with Addian's version of the facts in which it had not contracted to provide 3M masks and was not responsible for verifying their authenticity.

not ….").)  The record also contradicts this assertion.  Mr. Kamelhar testified that Mr. Wolworth had told him that "his supplier gets [the masks] from this 3M source in Shanghai" (D.E. 107-6 102:2–20), that he "believe[d] that Addam had the skills and knowledge needed to actually confirm authenticity one way or another" (*id.* at 112:20–23), and that he "expect[ed] for Addam to look at products on an individual basis and either confirm or deny that they were authentic" (*id.* at 114:13–17).  The record supports only that Addian formed a contract to sell 3M masks, so it is of no moment that Addian "never understood itself to be responsible" for verifying authenticity.  (Opp. at 11–12; *First Valley*, 795 F. Supp. at 696–97.)

On this evidence, there can be no genuine issue of material fact that the masks were counterfeit or that the brand of the masks was part of the basis of the bargain.  Addian offers no evidence to overcome TC's evidence that the masks were counterfeit, and Mr. Wolworth's testimony that it did not contract to provide 3M masks is unsupported by the record.  Accordingly, the only determination that a reasonable jury could make is that Addian failed to uphold its end of the deal, or breached its contract, by providing counterfeit masks.  *See Papergraphics Int'l, Inc. v. Correa*, 910 A.2d 625, 627 (N.J. Super. Ct. App. Div. 2006) (upholding grant of summary judgment on breach of contract when counterfeit goods were sold).

### iv.  Damages

It is undisputed that Aobvious suffered damages as a result of the transactions.  TC states that "Aobvious was damaged in the amount that it paid for the counterfeit goods, along with its lost profit for the sale of those goods to its downstream customer, TC."  (Mot. at 21.)  Addian does not address damages in its opposition brief.  Accordingly, and in view of the evidence that Aobvious paid for the masks and was never refunded, this element of TC's breach of contract

claim is met.  Because there is no genuine dispute over material facts to TC's breach of contract claim, summary judgment is granted with respect to breach of contract.

### B.  WARRANTIES        OF        MERCHANTABILITY        AND        AGAINST INFRINGEMENT

Next, TC seeks summary judgment on its claims that Addian breached the UCC's warranties of merchantability and against infringement.  (Mot. at 21–25.)  These warranties can only be enforced against sellers who are merchants under the UCC.  N.J.S.A. §§ 12A:2-314(1) ("[A] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."), 12A:2-312(3) ("[A] seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like …").  A "merchant" is someone who "deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction."  N.J.S.A. § 12A:2-104(1).

The parties dispute whether Addian was a merchant such that the implied warranties could apply to the transactions at issue.  TC argues that Addian was unquestionably a merchant of PPE. (Mot. at 23–24.)  It cites much evidence in support, but at bottom, it only conclusively establishes one other PPE transaction that Addian participated in as a seller.  (PSMF ¶ 63; DSMF ¶ 63; D.E. 106-34; D.E. 106-35.)  Most of TC's cited evidence, including documents identifying Addian as a "vendor" of PPE (D.E. 106-31; D.E. 106-32), Mr. Wolworth's testimony,[15] and an email from Mr. Wolworth (D.E. 106-25), leaves open the possibility that Addian sold PPE without conclusively

---

[15] Specifically, Mr. Wolworth testified that Addian had been involved, in a role that included "facilitat[ing] the acquisition," in 10–20 PPE transactions by August 2020 (D.E. 106-5 at 34:6–11) and that "most" of Addian's overall revenue from 2020–2023 came from PPE transactions (D.E. 108-4 at 48:23–49:17).

establishing it.[16]  Addian argues, for example, that the documents identifying it as a vendor do not

"address a completed transaction" (DSMF ¶ 58) and that Addian was involved in that transaction

"only for the purpose of performing its ordinary logistics and facilitation services" (DSAF ¶ 131).

Without more details on the transaction, it remains a genuine dispute whether Addian participated

in this transaction as a seller.

On this evidence, a reasonable jury could go either way on the question of whether Addian

"regularly" dealt in PPE or held itself out as having knowledge or skill peculiar to PPE.[17]

Accordingly, it cannot be decided at this stage that Addian was a merchant, so summary judgment

on breach of the warranties of merchantability and against infringement must be denied.

### C.  EXPRESS WARRANTY

Addian raises a choice of law question with the potential to affect the express warranty

claim.[18]  TC asserts the claim under New Jersey law (Mot. at 25), but Addian argues that Georgia

law should apply (Opp. at 26–28).  "[I]n a diversity action, a district court must apply the choice

of law rules of the forum state to determine what law will govern the substantive issues of a

case."  *Warriner v. Stanton,* 475 F.3d 497, 499–500 (3d Cir.2007) (citing *Klaxon Co. v. Stentor*

---

[16] TC also cites a July 2020 purchase order from TC to Addian for 3 million 3-ply PPE masks (D.E. 106-32), but it is genuinely disputed whether TC bought those masks from Aobvious or from Addian. (DSMF ¶¶ 59–60; PSAF ¶ 126; D.E. 107-5 80:23–81:21.)

[17] TC's cited cases all included more evidence of regular sales than this one.  In *W. Trenton Hardware, LLC v. Brooklyn Textiles, LLC*, Civ. No. 21-17662, 2024 WL 4263209, at *1 (D.N.J. Sept. 23, 2024), the seller had made 27 sales of gloves in three months, and it also did not dispute its status as a merchant.  In *Westmin Corp. v. Outokumpu Am. Brass, Inc.*, No. 03-3120, 2005 WL 8164784, at *12 (C.D. Ill. June 24, 2005), the seller had "sold bag house dust … on at least 25 occasions over a two year period."  *See also Nufeeds, Inc. v. Westmin Corp.*, No. Civ.A. 04-1071, 2006 WL 1000021, at *17 (M.D. Pa. Apr. 17, 2006) (finding that seller was a merchant on "same undisputed facts" as *Outokumpu*).

[18] Because the genuine dispute over Addian's merchant status was dispositive of the claims for breach of the warranties of merchantability and against infringement, they are unaffected by the conflict of laws issue.  Under both Georgia and New Jersey law, the warranties of merchantability and against infringement can be asserted only against merchants.  *Compare* N.J.S.A. §§, 12A:2-312(3), 12A:2-314(1), *with* Ga. Code Ann. §§ 11-2-312(3), 11-2-314(1).  The outcome would have been the same under either law, and absent a true conflict as to these claims, New Jersey law applies.  *Avram v. Samsung Elecs. Am., Inc.*, Civ. No. 11-6973, 2013 WL 3654090, at *7 (D.N.J. July 11, 2013).

22

*Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  In New Jersey, the court first "determine[s] whether a conflict actually exists between the potentially applicable laws."  *Avram v. Samsung Elecs. Am., Inc.*, Civ. No. 11-6973, 2013 WL 3654090, at *7 (D.N.J. July 11, 2013).  Absent a conflict, "the law of the forum state applies."  *Id.* (citing *Snyder v. Farnam Cos., Inc.*, 792 F. Supp. 2d 712, 717 (D.N.J. 2011)).  If the laws do conflict, the court determines "which state has the 'most significant relationship' to the claim at issue."  *Id.* at *8 (citing *Gilbert Spruance Co. v. Pa. Mfrs. Ass'n Ins. Co.*, 629 A.2d 885, 888 (N.J. 1993)).

Addian highlights the conflict between New Jersey and Georgia law underlying its argument.  While the New Jersey and Georgia laws setting forth the express warranty are substantively identically worded, *compare* N.J.S.A. § 12A:2-313 *with* Ga. Code Ann. § 11-2-313, only Georgia law requires that the claimant be in privity of contract with the seller.  *Compare Jones v. Cranman's Sporting Goods*, 237 S.E.2d 402, 405 (Ga. Ct. App. 1977) ("[I]n this state privity is required in order to impose liability under the theory of express or implied warranty."), *with Spring Motors Distribs., Inc. v. Ford Motor Co.*, 489 A.2d 660, 663 (N.J. 1985) ("[T]he buyer need not establish privity with the remote supplier to maintain an action for breach of express or implied warranties.").

According to Addian, under Georgia law, TC cannot assert its express warranty claim directly against Addian because TC lacked privity with Addian.  (Opp. at 26–28.)  TC argues "the issue of privity is irrelevant because TC stepped into the shoes of Aobvious who has direct contractual privity."  (Reply at 7 n.7.)

Aobvious's assignment of its claims indeed renders this conflict false with regard to liability; TC possesses at least one claim that can be asserted against Addian regardless of which state's law applies.  Under New Jersey law, TC could assert its own direct claim and Aobvious's

23

assigned claim.  Under Georgia law, even if TC's direct claim failed for lack of privity, the assigned claim could proceed, because Aobvious was in privity with Addian.  Either way, Addian's liability will be to TC.  Whether both or only the assigned claim prevail, however, can materially affect the outcome for TC.  TC appears to seek "the price paid by TC for the counterfeit goods and its lost profits" on its breach of express warranty claim.  (Mot. at 27.)  Absent a privity requirement, if TC succeeded on its express warranty claim, it could seek these damages.  Under Georgia's privity requirement, however, if TC succeeds on only the assigned claim, it could seek only the damages that *Aobvious* incurred because of Addian's breach of the warranty made to Aobvious. Because the outcome for TC would vary depending on which law applies, this is a true conflict.

The next question is which state has the most significant relationship to the claim.  The most significant relationship test considers many factors in connection with contractual claims: "(1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties."  *Payne v. FujiFilm U.S.A., Inc.*, Civ. No. 07-385, 2010 WL 2342388, at *10 (D.N.J. May 28, 2010).  Addian argues that "the presumptive choice of law is that of the state of Georgia" because it is where Addian issued the invoices and accepted Aobvious's payments.  (Opp. at 27.)  Aobvious is located in and incorporated in New Jersey.  (*Id.* at 27; D.E. 1 ¶ 2.)

Most of these factors point equally to Georgia and New Jersey—the contracts appear to all have been negotiated and performed virtually between Georgia and New Jersey, and their subject matter, the masks, was in neither.  (PSMF ¶ 21; DSMF ¶ 21; D.E. 106-19 at ADDIAN_000292.) The place of contracting, or "the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect," seems to favor Georgia.  *Clark*

*v. Prudential Ins. Co. of Am.*, Civ. No. 08-6197, 2009 WL 2959801, at *20 (D.N.J. Sept. 15, 2009).

Addian made its representations, directed the shipments, and accepted payment in Georgia. These acts, along with the issuance of the invoices, are critical to the contracts and warranties at issue here. Accordingly, and absent argument to the contrary by TC, the Court will apply Georgia law.

Given Georgia's privity requirement, summary judgment cannot be granted on TC's direct claim against Addian for breach of express warranty, because TC has not proven that it had privity with Addian. Summary judgment can be granted, however, on TC's assigned claim for breach of express warranty. Express warranties are created when a seller makes "[a]ny affirmation of fact or promise … to the buyer which relates to the goods and becomes part of the basis of the bargain," provides "[a]ny description of the goods which is made part of the basis of the bargain," or provides "[a]ny sample or model which is made part of the basis of the bargain." Ga. Code Ann. § 11-2-313. Item descriptions in contracts have been held to create express warranties. *See Bill Spreen Toyota, Inc. v. Jenquin*, 294 S.E.2d 533, 536 (Ga. Ct. App. 1982); *Century Dodge, Inc. v. Mobley*, 272 S.E.2d 502, 504 (Ga. Ct. App. 1980) (finding express warranty when "the car purchased was described as new in the contract").

This opinion has already established that— because of Mr. Wolworth's representations that the masks were 3M—the brand of masks was part of the basis of the bargain. (*See supra* pp. 18–20.) Addian again argues that it never affirmatively represented that the masks were 3M (Opp. at 25), but in view of the record evidence, Addian's assertion is simply counterfactual. If there were any doubt, under Georgia law, the invoices' description of the goods as "3M" creates an express warranty. *Bill Spreen*, 294 S.E.2d at 536; *Century Dodge*, 272 S.E.2d at 504. Addian offers no reliable record evidence that it did not make such representations, and it cannot create a genuine dispute at this stage by making statements that the record disproves.

Also as established above, the masks were in reality not 3M masks.  (*See supra* pp. 17–18, 20.)  On the evidence available here, a reasonable jury could find only that Addian breached its express warranty as to the brand of the masks, so summary judgment must be granted on TC's assigned claim of breach of express warranty.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, TC's motion for summary judgment is **GRANTED** as to breach of contract and breach of express warranty, and **DENIED** as to breach of the implied warranty of merchantability and the implied warranty against infringement.  An appropriate order follows.


/s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON, U.S.D.J.**


Orig:   Clerk
cc:     José R. Almonte, U.S.M.J.
        Parties